PEARSON, J.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:19CR717 |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | |
| | ) | |
| CHRISTIAN HAYWARD, | ) | **MEMORANDUM OF OPINION AND ORDER** |
| Defendant. | ) | [Resolving ECF No. 16] |

Pending is Defendant's Motion to Suppress Evidence and request for a hearing. ECF No. 16. The Government responded in opposition (ECF No. 27). Defendant did not reply. The Court, having considered the parties' filings and applicable law, as well as the evidence and argument presented at the October 15, 2020, evidentiary hearing, denies Defendant's motion, as explained below.

### I. Factual Background

On October 24, 2019 at approximately 6:15 a.m., interdiction officers of the Omaha Nebraska DEA Field Division were conducting undercover operations at a Greyhound bus terminal in Omaha. ECF No. 16-2 at PageID #: 104.[1] Investigators boarded a bus en route from Los Angeles, California to Cleveland, Ohio, while passengers were off the bus during a scheduled stop. *Id*. Officers noticed a blue Nike duffel bag with no tags or markings on a bus

---

[1] ECF No. 16-2 was admitted as evidence at the hearing as Defense Exhibit D5.

(1:19CR717)

seat. *Id*. The officers waited toward the rear of the bus as the passengers re-boarded to see whom would claim the bag.

Officers observed a man ("the courier") board the bus and sit in a seat in the row directly behind the duffel bag. *Id*. Officers then witnessed the courier attempt to distance himself from the bag. *Id*. The courier also made statements which indicated to the officers that he was "playing dumb" about his connection to the bag. *Id*. Eventually officers saw the courier take the duffel bag, open it, and obtain a cough drop from inside. *Id*.

Having observed the courier access the contents of the duffel bag, Officers approached him, identified themselves as law enforcement, and asked him questions about his identity and travel plans. *Id*. The courier stated that he was traveling from Los Angeles to Cleveland on a one-way ticket he had purchased with cash. *Id*. at PageID #: 105. The officers asked the courier if he would consent to a search of the bag, and then whether he would consent to a canine sniff of the bag; he refused both. *Id*. Based on the officers' observations of the courier's activity and the particularities of his travel, officers temporarily detained the courier and, within a few minutes, brought a certified police canine to conduct an open air sniff. *Id*.

The canine alerted to the presence of contraband in the duffel bag. *Id*. After informing the courier of his *Miranda* rights, officers informed him that they intended to seek a search warrant for the bag. *Id*. In response, the courier explained that he did not pack the bag, and indicated that there was something illegal inside, he granted the officers consent to search the bag. *Id*.

2

(1:19CR717)

The search of the duffel bag revealed fifteen pounds of methamphetamine, each pound individually wrapped in cellophane. *Id*. at PageID #: 106. After the officers discovered the methamphetamine from the bag, the courier agreed to cooperate with investigators. *Id*. He stated that he was transporting the bag of methamphetamine to Cleveland, Ohio where he planned to deliver it to Defendant, Christian Hayward. *Id*. The courier provided investigators with a telephone number ("310 phone number") that he had been using to contact Defendant throughout his trip to Cleveland. *Id*.

The courier stated that he and Defendant had been together in Los Angeles a few days earlier and the courier had watched Defendant pack the methamphetamine in the duffel bag. *Id*. The courier recounted that he watched Defendant wipe each methamphetamine package with alcohol before placing it in the duffel bag. *Id*. The courier also stated that he had made several similar trips in the past for Defendant, and that typically Defendant would meet him at the bus station in Cleveland, where the courier would hand Defendant the bag. *Id*. The courier indicated that he expected the trip he was on to go the same way. *Id*. The courier also explained the method by which Defendant typically kept tabs on him during a trip, by calling and texting at unplanned times, expecting an immediate response. *See* Exhibit D3 (video recording of officer encounter with the courier).

The courier allowed investigators to search his cell phone. *Id*. at PageID #: 107. Following the courier's instructions on how to locate specific messages, officers reviewed a text message conversation between the courier and the 310 phone number the courier indicated belonged to Defendant. The messages illustrated that both were aware they were engaged in

3

(1:19CR717)

illegal activity.² *Id*. The courier agreed to contact Defendant and feign that he was still en route to Cleveland via Greyhound bus. *Id*. Defendant responded, "Yep" to the courier's message asking whether Defendant was "On schedule[.]" *Id*. With the courier's consent, investigators began to use the courier's cell phone to communicate back and forth with Defendant, representing that the courier was still en route to Cleveland, as planned. *Id*. at PageID #: 108. The courier identified a second telephone number that he used to communicate with Defendant ("702 phone number"), and a search of the courier's phone for messages from that number corroborated his claim that he had made prior trips for Defendant. *Id*.

Armed with the foregoing information from the courier, relayed by the officers on the bus, DEA agents in Cleveland, Ohio obtained a search warrant authorizing the acquisition of precise location information from the 310 phone number that Defendant used to communicate with the courier on October 24, 2019. ECF No. 16-1.³ The information contained in the affidavit included the identity of the courier, the information the courier provided about Defendant, and text messages from the phone the courier used to communicate with Defendant throughout his journey from California to Ohio. *See id*. at PageID #: 88-92; *see also* ECF No. 27 at PageID #: 177-78 n.1.

---

² During their conversation, the courier texted Defendant, "A bunch of cops at this stop bro. Like a ton!! 91111." *Id*. Defendant responded, "Yo," and another text that said "Yo." *Id*. The courier then responded, "Can't talk they on the bus hold on." *Id*. Defendant then said, "What you mean they on the bus." *Id*. Defendant also texted, "I didn't know you had anything on you when you left. You cool u don't have warrants do u?" *Id*. The courier responded, "Huh?" and then replied, "Never mind we pulling off. Text you when I get to Des Moines." *Id*.

³ ECF No. 16-1 was admitted as evidence at the hearing as Defense Exhibit D4.

4

(1:19CR717)

On October 25, 2019 at approximately 2:25 a.m., DEA agents located Defendant driving a silver Honda approaching the Greyhound Bus station in Cleveland, Ohio. ECF No. 16-2 at PageID #: 110. Officers stopped the vehicle and arrested Defendant. *Id*. at PageID #: 111. The officers then called the 310 phone number suspected of being used by Defendant to communicate with the courier. In response, one of the phones in the center console of the Honda rang and displayed the investigator's telephone number on its screen face. *Id*. Agent Nowling testified at the evidentiary hearing that the passenger in Defendant's car also corroborated that the 310 number was associated with Defendant's phone. Defendant was given Miranda warnings at 2:35 a.m. and agreed to speak with Special Agent Nowling. ECF No. 16-2 at PageID #: 111. When Agent Nowling asked Defendant why he was downtown at 2:30 a.m., Defendant responded that he was just driving around, but later admitted that he was going to the bus station to "pick up a friend." *Id*. at PageID #: 112. When asked who he was picking up, Defendant refused to respond and requested a lawyer. *Id*.

On November 18, 2019, United States Magistrate Judge Jonathan D. Greenberg authorized a search warrant for the (historical) cell-site location information of the two telephone numbers Defendant used to communicate with the courier. ECF No. 16-1. As a result of that search warrant, investigators learned that Defendant had made several trips to the Los Angeles, California area prior to his arrest in this case. *See* ECF No. 27 at PageID #: 164. Records obtained from United Airlines also "verified the [courier's] statement indicating that HAYWARD was in California during the allotted time frame to personally pack the duffle bag himself with the methampehdameine[.]" Exhibit D3.

(1:19CR717)

## II.  Law & Analysis

Defendant moves the Court to suppress the following evidence: the initial inspection and seizure of the duffel bag, the canine sniff of the duffel bag, precise location information of one cell phone, his arrest, his statements to law enforcement made after his arrest, and (historical) cell-site location information for two cell phones.  ECF No. 16 at PageID #: 69.  Each of Defendant's alleged Fourth Amendment violations is addressed below.

**A.  Duffel Bag**

**1.  Defendant lacks standing to challenge the inspection, seizure, and canine sniff of the duffel bag**.

At the threshold, the Government disputes Defendant's standing to challenge the inspection, seizure, and canine sniff of the duffel bag.  ECF No. 27 at PageID #: 165.  Defendant has the burden of establishing his standing to assert a Fourth Amendment violation.  *See United States v. Salvucci*, 448 U.S. 83, 86 (1980); *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001)*.

"Fourth Amendment rights are personal rights which . . . may not be vicariously asserted."  *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978).  Because the Fourth Amendment protects "people not places" *Katz v. United States*, 389 U.S. 347, 351 (1967), Defendant has standing to challenge the admission of evidence only if Defendant's own constitutional rights have been violated.  *Rakas*, 439 U.S. at 133-34 (finding a person does not have standing to assert a Fourth Amendment challenge simply because he is aggrieved by the introduction of damaging evidence seized from a third party); *see also United States v. Padilla*, 508 U.S. 77, 87 (1993);

6

(1:19CR717)

United States v. Davis, 430 F.3d 345, 359–60 (6th Cir. 2005). Moreover, "[c]oconspirators and codefendants have been accorded no special standing." Padilla, 508 U.S. at 82 (quoting Alderman v. United States, 394 U.S. 165, 171-72 (1969)); see also United States v. Williams, 354 F.3d 497, 511 (6th Cir. 2003).

Whether Defendant has standing to challenge the inspection, seizure, and canine sniff of the duffel bag depends on whether he had a "reasonable expectation of privacy" in the bag or its contents. See United States v. Thomas, 662 F. App'x 391 (6th Cir. 2016). The Sixth Circuit applies the following two-part test to determine whether a criminal defendant has a reasonable expectation of privacy: "First, we ask whether the individual, by conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private . . . Second, we inquire whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable." United States v. Waller, 426 F.3d 838, 844 (6th Cir. 2005).

Defendant does not dispute that he intended for the courier to transport methamphetamine, inside the duffel bag, across the country on a multi-day bus ride.[4] There is also no dispute that the bag was not locked; that the courier was aware of the contents of the bag;[5] that the bag was, aside from the methamphetamine, filled only with the courier's personal

---

[4] Defendant cannot otherwise plausibly claim to be a bailor. ECF No. 16 at PageID #: 74.

[5] Although the courier stated there was no contraband in the bag when he was first approached by officers, and later, while he was consenting to a search of the bag, stated that he believed there was likely some contraband inside the bag, but that he did

(continued...)

7

(1:19CR717)

possessions; and that the courier had complete access, use, and control of the contents of the bag throughout his travels. The record suggests that the courier was an active co-conspirator in the drug trafficking operation who, during all relevant times, exhibited dominion and control over the duffel bag. Indeed, officers did not approach the courier until they saw him open the bag and access its contents.

Defendant asserts two general theories of standing, a bailment theory and a joint ownership theory. Both theories are fatally flawed.

First, relying on *United States v. Freire*, 710 F.2d 1515 (11th Cir. 1983), Defendant argues that he had an enduring privacy interest in the bag, created through a bailment relationship with the courier. *See* ECF No. 16 at PageID #: 74. In *Freire*, police seized the defendant's briefcase during a search of a third party's car while defendant was a passenger in a nearby moving van. 710 F.2d at 1517. The defendant had previously given the closed briefcase to his co-defendant, a passenger in the third party's car, and the co-defendant testified extensively that it was expected that he was to respect the defendant's privacy in the contents. *Id*. at 1518. No evidence was presented that the co-defendant had, in fact, opened the briefcase or accessed its contents, and there was no dispute that the briefcase and all of its contents did, in fact, belong to the defendant. The Eleventh Circuit found that the defendant had standing to contest the search

---

⁵(...continued)
not know exactly what it was, Exhibit D1, the record as a whole, including the courier's statements after officers searched the bag, makes clear that the courier was fully aware of the bag's contents, and his statements to the contrary were further attempts at playing dumb, similar to his earlier attempts to distance himself from the bag before he retrieved the cough drop.

8

(1:19CR717)

of his unlocked,[6] but unopened, briefcase. The court relied heavily on the co-defendant's testimony that he was entrusted with the briefcase and "was expected to respect" the defendant's privacy. *Id*. It helped that the van in which Freire rode and the car containing his briefcase were in close proximity. In fact, the vehicles were acting in concert and their actions were such that "it became apparent to the agents that the vehicles were undertaking countersurveillance tactics[,]" causing police to stop both vehicles. *Id*, 710 F.2d at 1517.

Defendant's reliance on *Freire* is misplaced. The seizure of the duffel bag in this case is easily distinguishable from the circumstances under which the brief case was seized in *Freire*. Defendant was not in a nearby vehicle. He was over 800 miles away. Another individual's duffel bag is not akin to a person's own briefcase, and no argument been advanced that the courier was under instructions not to open or use the bag that contained all that he posessed on a multi-day trip.

The Eleventh Circuit, when it decided *Freire* in 1983, explained that its decision rested on the specific use of, and resulting societal expectations surrounding, one's own briefcases at the time:

> A briefcase is often the repository for more than business documents. Rather, it is the extension of one's own clothing because it serves as a larger "pocket" in which such items as wallets and credit cards, address books, personal calendar/diaries, correspondence, and reading glasses often are carried. Few places outside one's home justify a greater expectation of privacy than does the briefcase.

---

[6] The briefcase was not locked: "The agents then opened and searched the trunk of the car where they found two closed, but unlocked briefcases." *Freire*, 710 F.2d at 1518. Government counsel's indicated to the contrary at the hearing.

9

(1:19CR717)

*Freire*, 710 F.2d at 1519. The Court does not find that a duffel bag, generally, engenders the same inherent heightened privacy expectations as a briefcase,[7] nor has any evidence been presented that the duffel bag belonged to Defendant, or that it contained any of Defendant's personal possessions, let alone inherently personal or private papers. Defendant only claims that the methamphetamine within the bag was his, not the bag itself or the other contents.

Additionally, and perhaps more importantly, the courier, who at all times controlled the duffel bag and its contents, was not bound to maintain the privacy of the bag. As the record shows, the courier accessed the contents of the duffel bag in the plain view of officers.[8] *See* ECF No. 16-2 at PageID #: 104. The duffel bag was the only item, other than the clothes on his back, that the courier had with him on a multi-day bus trip, and contained the courier's personal items, including his clothes and underwear. *See* Exhibit D1. The contraband was not in any isolated compartment, and, even it were, the Court is not bound to, nor would it "engage in such metaphysical subtleties" and sub-divide a single, unlocked bag. *Frazier v. Cupp*, 394 U.S. 731, 740 (1969).

Furthermore, under Defendant's bailment theory of standing, "[w]hen assessing whether a bailor has assumed the risk that the bailee would consent to a search of the bailed effects, courts

---

[7] *See United States v. Reyes Reyes*, No. CR 19-10030-DPW, 2020 WL 4352859, at *9-10 (D. Mass. July 29, 2020) (society's expectation of privacy in a car being shipped is less than in a letter being mailed).

[8] For the sake of clarity, the Court notes that the courier and the bag itself were in plain view when he opened the bag to retrieve the cough drop. The Court does not find, nor does the government argue, that the contraband within the bag was in the plain view of the officers.

(1:19CR717)

generally analyze 'the extent to which the bailor made efforts to secure, *even as against the bailee*, the privacy of his effects.'" *Horton v. Vinson*, No. 1:14CV192, 2015 WL 4774276, at *20-21 (N.D.W. Va. Aug. 12, 2015) (quoting Wayne R. LaFave, 4 Search & Seizure § 8.6(a), Consent by bailee (5th ed.)) (collecting cases, emphasis added). Defendant argues that the courier's statement to officers that, after Defendant put the contraband in the bag, he instructed the courier not to look, Exhibit D1, not only to establish the bailor bailee relationship, but to show that he made efforts to maintain the privacy of the contraband, giving rise to his allegedly reasonable, subjective, expectation that it would be kept safe.

Even crediting the courier's statement that Defendant instructed him not to look, which the Court notes is contradicted by other evidence of record, the Court finds that Defendant made no material effort to secure the contraband in the duffel from the courier. Any such request, simply as a matter of logic, would have been unreasonable at the time it was made given the quantity of drugs, the size of the bag and common compartment the drugs and clothing were in, and the conceded expectation that the drugs would be covered only by the courier's personal belongings, which he would need to access, remove, and replace over the course of his three-day journey. Indeed, Defendant does not claim ownership of the bag itself, yet the courier does in his interactions with officers. Defendant freely acknowledges, though counsel, that the understanding between himself and the courier was that the courier would access the bag throughout his journey, and store his personal belongings in it. Accordingly, any subjective privacy interest Defendant alleges in the duffel bag was relinquished when Defendant disassociated from it in Los Angeles. *See, e.g., United States v. Bodnar*, No. 3:17CR157 (JBA),

(1:19CR717)

2019 WL 582478, at *5 (D. Conn. Feb. 13, 2019) (Defendant who was not present for the search of his duffel bag after turning it over to a third party for a trip on a "readily-mobile" vehicle lacked standing to challenge a search of the bag)

Defendant argues, under his second theory of standing, that such a "joint possessory interest," with the courier and the courier alone, would allow the courier to consent to a search of the bag, but would still give Defendant standing to challenge any search of the bag before the consent was given, and to challenge the validity of the consent.

While there might be some logic to that argument if Defendant were claiming that the bag, or any of its non-contraband contents, were his. He makes no such claim. The facts of this case fall plainly within a long line of authority concluding that the placement of personal property into a closed container does not create a privacy interest that society is willing to accept as reasonable. *Rawlings v. Kentucky*, 448 U.S. 98, 103-06 (1980) (No legitimate expectation of privacy in drugs stored in girlfriend's purse, even when defendant was close by.); *United States v. Trejo*, 135 F. Supp. 3d 1023, 1033 (D.S.D. 2015) (A court cannot find standing when "the defendant had not presented any evidence that he owned the suitcase, had historical use of it, had the ability regulate access to it (the suitcase was only zipped shut and had no lock), or that the suitcase had identification tags indicating that the bag belonged to the defendant."). Simply put, stuffing contraband into someone else's luggage does not create a reasonable expectation of privacy in that luggage.

Whether the Court speaks in terms of a bailment relationship, joint interest in the bag that gives Defendant the right to expect that only the courier will access it, or otherwise, the decisive

12

(1:19CR717)

question the Court must answer for the purpose of deciding whether standing exists is if Defendant has proven that he had both subjectively and objectively reasonable expectations of privacy in the duffel bag. *Waller*, 426 F.3d at 844. He has not carried that burden. To the extent Defendant asserts any subjective expectation of privacy in a duffel bag chocked full of methamphetamine and someone else's personal belongings, the Courts finds that interest is not one society is prepared to recognize as objectively reasonable. *See United States v. Rodriguez-Ramos,* 704 F.2d 17 (1st Cir. 1983) (no reasonable expectation of privacy in unsealed envelope inside bag carried by, and containing the personal possessions of, traveling companion); *see also Waller*, 426 F.3d at 844.

Accordingly, Defendant does not have standing to challenge the inspection, seizure, or canine sniff of the duffel bag.

**B.     Precise Location Information of "310 Phone"**

Defendant alleges that the warrant obtained to retrieve precise location information from the 310 phone number did not allege sufficient probable cause. ECF No. 16 at PageID #: 78. He avers that text messages between the courier and himself, on the 310 phone, contradict the courier's statements to investigators about Defendant's involvement in the drug trafficking operation.

To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must only contain facts that support a "fair probability" that evidence of a crime will be located. *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005). The text messages between the courier and Defendant via the 310 phone number support that Defendant was aware the courier

13

(1:19CR717)

was transporting drugs. The text messages also suggest he was concerned about the courier's exposure to police presence while possessing the duffel. *See* ECF No. 16-2 at PageID #: 107. Defendant's involvement in the drug trafficking operation was corroborated by older text messages in the courier's phone, sent from Defendant. Messages sent from the 702 phone number, listing "Chris Street God" as the contact, indicate Defendant reached out to the courier in July 2019 and asked that he transport drugs across state lines while riding a bus. *See id.* at PageID #: 108.

Accordingly, the magistrate judge reasonably concluded that the text message conversation between the courier and Defendant via the 310 phone number, when combined with other reliable information as noted, established probable cause that the 310 phone number was being used to coordinate a methamphetamine shipment to Cleveland, Ohio on or about October 24, 2019. Thus, the warrant alleged sufficient probable cause.

### C. Defendant's Arrest and Custodial Statements

#### 1. Arrest

Defendant alleges that officers did not have probable cause to arrest him on October 25, 2019. ECF No. 16 at PageID #: 80. He argues that the only basis for his arrest was information obtained from the courier, which cannot be deemed credible. *Id*.

A determination of whether probable cause existed to arrest a defendant requires the district court to examine the totality of the circumstances. *United States v. Bass*, 785 F.3d 1043, 1049 (6th Cir. 2015). Courts may "consider only the information possessed by the arresting officer at the time of the arrest." *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008). "A

(1:19CR717)

finding of probable cause does not require evidence that is completely convincing or even evidence that would be admissible at trial; all that is required is that the evidence be sufficient to lead a reasonable officer to conclude that the arrestee has committed or is committing a crime." *Id*.

Prior Defendant's arrest, officers gathered credible information in addition to that learned from the courier, including controlled text messages the courier made to Defendant at the direction of the DEA (ECF No. 16-2 at PageID #: 107), and additional text messages between the courier and Defendant from July 2019 (*Id*. at PageID #: 108) that corroborate the courier's information that he and Defendant made similar drug transportations prior to October 24, 2019. Once agents were able to track Defendant's phone, officers also witnessed Defendant approach the Cleveland, Ohio Greyhound bus station at 2:25 a.m. *Id*. at PageID #: 110-11.

While Defendant contends the courier's information was not reliable, the Court finds otherwise. While the courier's statements alone, might not have provided sufficient probable cause, the Court is required to look not only at the information the courier gave, but at the totality of the circumstances including whether officers independently confirmed the information provided by the courier. *See Frazier*, 423 F.3d at 532 (observing that "in the absence of any indicia of the informants' reliability, courts insist that the affidavit contain substantial independent police corroboration"); *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003) (noting that "a court must consider the veracity, reliability, and the basis of knowledge for that information as part of the totality of the circumstances for evaluating the impact of that information"). Through corroborating evidence, including controlled text messages, a phone in

15

(1:19CR717)

Defendant's possession responding to a call to the 310 number, and the witnessing of Defendant approaching the Greyhound bus station in accordance with the courier's and Defendant's scheduled drug interception, there was sufficient probable cause to arrest Defendant.

Accordingly, the Court finds that officers had sufficient probable cause to arrest Defendant.

### 2. Custodial statements

A defendant's statements, made subsequent to arrest, are inadmissable once he invokes his right to remain silent. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966) (finding once a defendant has invoked his right to remain silent, police must stop further interrogation and "scrupulously honor" his choice); *Fleming v. Metrish*, 556 F.3d 520, 525 (6th Cir. 2009). A waiver of *Miranda* rights must be voluntary, that is, "the product of a free and deliberate choice rather than intimidation, coercion or deception." *United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009).

The record demonstrates that at the time of Defendant's arrest he was read his *Miranda* rights and stated that he understood his rights. ECF No. 16-2 at PageID #: 111. Agent Nowling then asked him several questions, including whether he was on supervised release, why he was being arrested, if he had been texting back in forth with someone, and where he was heading at 2:30 a.m. *Id*. Defendant indicated he was confused about why he was being arrested, but answered Agent Nowling's questions and did not reject further questioning until Agent Nowling asked the name of the individual he planned to pick up from the Greyhound bus station. *See id.* at PageID #: 112. At that point, Defendant requested that he be able to speak to his attorney. *Id*.

(1:19CR717)

In response, Agent Nowling terminated the interview and ceased all questioning. *Id*. On these facts, the Court does not find that Defendant was coerced into giving self-incriminating testimony after Defendant invoked his *Miranda* rights. No statements were made by Defendant, after he requested counsel.

Accordingly, the statements Defendant made after his arrest are admissible.

### D. Cell-site Information of "301 Phone" and "702 Phone"

Defendant contests a second warrant that was issued to retrieve (historical) cell-site location data of two cell phones recovered from Defendant. ECF No. 16 at PageID #: 81.

DEA investigators sought the cell-site location data for two of Defendant's cell phones in an effort to identify Defendant's location at the times the courier stated Defendant was in California arranging drug shipments: the 310 phone number that Defendant was using to communicate with the courier, and the 702 phone number that had previously been used to communicate with the courier regarding a prior drug shipment. ECF No. 16-2. The affidavit in support of the second warrant outlined significant information gathered throughout the investigation of Defendant, including: information the courier provided to agents regarding the drug trafficking operation he and Defendant were part of, text messages from the courier's phone corroborating the courier's information that he and Defendant were conspiring to transport narcotics on October 24, 2019, and July 2019 text messages between Defendant–identified as "Chris Street God" in the courier's phone–and the courier about a prior trip for which Defendant agreed to pay the courier $1,500.00 to transport drugs. *See id*. The courier also gave a description of how Defendant typically checked in while drugs were being transported, which

17

(1:19CR717)

was corroborated by the courier's phone log. Exhibit D1. Taken together, the facts provided in the affidavit suggested a "fair probability" that Defendant had conspired to possess, with the intent to distribute, controlled substances, and had used the 301 and 702 phone numbers in the course of his criminal activity. *Frazier*, 423 F.3d at 531.

Accordingly, the Court finds that the magistrate judge had a substantial basis for determining that probable cause existed to issue the warrant for the historical information for both phones.

### III. Conclusion

For the foregoing reasons, Defendant's Motion to Suppress (ECF No. 16) is denied.

IT IS SO ORDERED.

| | |
|---|---|
| October 19, 2020 | /s/ Benita Y. Pearson |
| Date | Benita Y. Pearson |
| | United States District Judge |